UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

CECIL BARRETT, JR.,              )
CYNTHIA BARRETT, JEAN            )
BLANCO GUERRIER,                 )
JACQUELINE GRISSETT,             )
CRAIG GRISSETT, STEVEN           )   Civil Action
PARHAM, BETTY HOFFMAN,           )   No. 08-10157-RWZ
DORIS MURRAY, JOSLYN DAY         )
and KEISHA CHAVERS on            )
behalf of themselves and         )
all others similarly             )
situated,                        )
                                 )
    Plaintiffs,                  )
                                 )
                                 )
vs.                              )
                                 )
OPTION ONE MORTGAGE              )
CORPORATION and H&R BLOCK        )
MORTGAGE CORP., N/K/A            )
OPTION ONE MORTGAGE              )
SERVICES INC.,                   )
                                 )
    Defendants.                  )


**MOTIONS HEARING**

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
September 16, 2010
2:45 p.m.

*   *   *   *

CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

```
 1
      APPEARANCES:
 2
      For the Plaintiffs:
 3

 4
      RODDY KLEIN & RYAN
 5     By:  Gary E. Klein, Esq., and
           Shennan Alexandra Kavanagh,
 6         Esq.
           727 Atlantic Avenue
 7         Boston, MA 02111

 8     -and-

 9      NATIONAL CONSUMER LAW CENTER
       By:   Stuart T. Rossman, Esq.
10           7 Winthrop Square
             Boston, MA 02110
11

12

13     For the Defendants:

14
       O'MELVENY & MYERS LLP
15     By:   Brian P. Brooks, Esq., and
             Elizabeth L. McKeen, Esq.)
16           1625 Eye Street NW
             Washington, DC 20006
17
       -and-
18
       CAMPBELL, CAMPBELL, EDWARDS & CONROY, PC
19     By:  Kathleen M. Guilfoyle, Esq.
             One Constitution Plaza
20           Third Floor
             Boston, MA 02129
21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            (The following proceedings were held in open
    court before the Honorable Rya W. Zobel, United States
 3
 4   District Judge, United States District Court, District
 5   of Massachusetts, at the John J. Moakley United States
 6   Courthouse, 1 Courthouse Way, Boston, Massachusetts, on
 7   September 16, 2010.)
 8                   THE COURT:  Who is here for the plaintiff?
 9                   MR. KLEIN:  Gary Klein, your Honor, Roddy
10   Klein & Ryan for the plaintiffs.
11                   MS. KAVANAGH:  Shennan Kavanagh, Roddy,
12   Klein & Ryan for the plaintiffs.
13                   MR. ROSSMAN:  Stuart Rossman for the
14   National Consumer Law Center on behalf of the plaintiffs.
15                   MR. BROOKS:  Your Honor, Brian Brooks for
16   the defendants.
17                   MS. McKEEN:  Elizabeth McKeen.
18                   THE COURT:  Hold it.  Hold it.  Lots of
19   plaintiffs.
20                   Okay.  Mr. Brooks?
21                   MR. BROOKS:  Yes, your Honor.
22                   MS. McKEEN:  Elizabeth McKeen, also for
23   defendants.
24                   THE COURT:  Okay.
25                   MS. GUILFOYLE:  Kathleen Guilfoyle for the
```

PDF created with pdfFactory trial version www.pdffactory.com

1  defendants.

2                    THE COURT:  That's it?

3                    MR. BROOKS:  Your Honor, we do have a

4  handful of demonstratives we just wanted to bring up here

5  so as not to disturb counsel's argument, if the Court

6  would give us 20 seconds to do that.

7                    THE COURT:  You go right ahead, but you got

8  20 minutes apiece.  So, I don't know what you're going to

9  do with your demonstrative exhibits.

10                    MR. BROOKS:  They'll go very quickly.

11                    THE COURT:  While you're doing that, as best

12  as I understand, there are a couple of motions that I

13  suspect are not an issue for you.

14                    No. 84, joint motion to substitute documents

15  under seal is allowed.  No. 90, a similar motion, is

16  allowed, and then there is a motion to file excessive, I

17  think, reply briefs, No. 94.

18                    MR. KLEIN:  Your Honor, there's a motion to

19  allow a reply brief at all, but we did ask to file a

20  reply brief of ten pages.

21                    THE COURT:  Which they point out is really

22  13.

23                    MR. KLEIN:  Your Honor, I think that that

24  was unfair.  We believe we complied with the rule.

25  However, we've also submitted an alternative version of

PDF created with pdfFactory trial version www.pdffactory.com

1 the brief that is doubled spaced and complies with what

2 the defendant believes the rule is.

3            THE COURT:  How long is it?

4            MR. KLEIN:  That's also ten pages.  They're

5 both ten pages.

6            THE COURT:  I'll take the second ten-page

7 one.

8            MR. BROOKS:  Without objection, your Honor.

9            THE COURT:  So, No. 94 is allowed as to the

10 second version.

11            MR. BROOKS:  Thank you, your Honor.

12            MR. KLEIN:  That's attached to Ms.

13 Kavanagh's declaration, your Honor.

14            THE COURT:  I'm sorry?

15            MR. KLEIN:  That's the one that's attached

16 to Ms. Kavanagh's declaration.

17            THE COURT:  Okay.

18            And then we have the motion to certify the

19 class, which, I guess, is why we're really here.

20            MS. KAVANAGH:  Your Honor, one quick

21 question, I'm sorry.  Can we file the reply brief

22 electronically as well as the documents that we intend to

23 substitute for the under-seal documents electronically?

24            THE COURT:  Sure.

25            MS. KAVANAGH:  Okay.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. KLEIN:  Your Honor, this is plaintiff's

2  motion for class certification in a case that's

3  extraordinarily important to the civil rights community.

4          THE COURT:  Before you go on, how in your

5  various statistical models, or elsewhere, do you decide

6  which of the borrowers is black and which is white?

7          MR. KLEIN:  That's actually very simple,

8  your Honor.  The records that Option One maintained are

9  required by law to distinguish black borrowers because

10 of the requirements of the Home Mortgage Disclosure Act.

11 Under the Home Mortgage Disclosure Act mortgage

12 companies --

13         THE COURT:  So, for the entire period --

14         MR. KLEIN:  Correct.

15         THE COURT:  -- people are identified as

16 either African-American or white?

17         MR. KLEIN:  Correct.  There really isn't a

18 dispute between the parties on that issue.  The records

19 are clear which borrowers are African-American and which

20 are white.

21         THE COURT:  Okay.

22         MR. KLEIN:  The plaintiffs here are Cecil

23 and Cynthia Barrett, a UPS employee and a social worker;

24 Jean Guerrier, who is a cook; Jacqueline and Craig

25 Grissett, benefits analyst for Blue Cross/Blue Shield;

1  Betty and Edward Hoffman, who is a church worker; Steven

2  Parham, who is a Boston police officer; Doris Murray, who

3  is a Social Security Administration employee; Joyslyn

4  Day, who is a state employee at the Department of Public

5  Utilities; and Keisha Chavers, who works at a radio

6  station.  Many of these individuals are in the courtroom.

7          There are eleven African-American homeowners

8  who receive loans at rates higher from Option One than

9  similarly-situated by white homeowners.

10          The defendant, Option One, was a sub-prime

11 lender that was extraordinarily active across the country

12 from 2001 to 2007.  Option One was a sub-prime lender.

13 It originated on -- it originated loans on an originate-

14 to-sell model.  That is, the higher price of the loan and

15 the greater the loan size, the higher they could sell

16 that loan for in the secondary market.  In many cases

17 these loans were made and sold on the same day.

18          Plaintiffs are challenging Option One's

19 discretionary system for pricing their mortgages.  The

20 parties have made a very substantial record, your Honor,

21 and we believe it supports every element for class

22 certification.

23          Importantly, Option One, through its

24 30(b)(6) witnesses, has acknowledged both the existence

25 of a discretionary pricing policy and that every one of

PDF created with pdfFactory trial version www.pdffactory.com

1  these plaintiffs was impacted by the policy.  That is,

2  they were exposed to the policy and were charged -- they

3  had loans that included discretionary elements to their

4  price.  These discretionary elements of the price were

5  not related to credit characteristics or to loan risk.

6          More specifically, to describe the policy --

7  the pricing policy, there are two elements.  The first

8  was an entirely objective element, which Option One, we

9  understand, called its "rate sheet pricing policy."  That

10 aspect of the policy was grounded entirely in objective

11 underwriting credit characteristics and loan

12 characteristics.

13         All of the data on the objective

14 characteristics that were used in the rate sheet pricing

15 policy were included in Option One's data and were

16 available to both parties' experts for analysis.

17         THE COURT:  I don't quite understand why we

18 need experts to do this.  I mean, if, in fact, it was as

19 simple as you say, that is there was a policy -- there

20 was a rate based on objective criteria and then there was

21 a rate that some people actually paid, then why do we

22 need to go to statistics?  Why can't we simply look at

23 the loans of the people who paid the rate and the loans

24 of the people who paid the extra and then look at what it

25 says about their race?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. KLEIN:  The reason for that, your Honor,

2   is that in order to evaluate the difference -- the

3   disparity between what African-American homeowners paid

4   and what white homeowners paid, one needs to use

5   regression to --

6          THE COURT:  Why?

7          MR. KLEIN:  -- to take out the

8   characteristics that are legitimate business

9   characteristics, most of which are issues that were

10  addressed by Option One under its pricing policy from the

11  rate sheets.  Nevertheless, there's no non -- there's no

12  Option One price that is specific to the rate sheet

13  price.  The entire price is what's listed in the records.

14  So, we have to reverse engineer, essentially, to get back

15  to the --

16         THE COURT:  I don't understand that.  I

17  mean, if there was a rate sheet price that you say was

18  available and given to white borrowers -- right?

19         MR. KLEIN:  White borrowers didn't --

20  everybody was exposed to the discretionary pricing

21  policy, both white and black borrowers.  So, the white --

22         THE COURT:  So, where does the differential

23  impact occur?  So why -- I mean, unless it is that more

24  African-American borrowers paid a higher price -- I mean,

25  you're not saying that they didn't pay the rate sheet

1 price; they just paid a higher price, including a higher

2 discretionary price, than the discretionary price charged

3 white borrowers.

4          MR. KLEIN:  That's essentially correct, your

5 Honor.

6          What happened is that the decision-makers

7 who had discretionary authority under the policy added

8 more -- added higher add-ons and markup charges to the

9 African-American borrowers than to the white borrowers.

10          THE COURT:  Nationally?

11          MR. KLEIN:  Nationally, your Honor, yes.

12          THE COURT:  Okay.

13          MR. KLEIN:  And that's what the experts have

14 done, essentially, is to reverse engineer the final price

15 to get back to the disparity, which can't be explained by

16 objective business justifiable factors.

17          THE COURT:  It's not clear to me why you

18 need to go through that.  I mean, if, in fact,

19 African-Americans got charged more than white people, why

20 do we need to go to the statistics?

21          MR. KLEIN:  Well, the reality is

22 African-Americans were charged more than white people.

23 They were charged about 45 basis points more than white

24 people.  The issue then would be whether any of that

25 disparity can be explained by legitimate credit

PDF created with pdfFactory trial version www.pdffactory.com

1    characteristics or other issues.  So, what the experts

2    have done is they've run regressions to take out any

3    facts associated with legitimate business

4    characteristics.

5                    So, for example, if blacks and whites on

6    average have different credit scores, what the regression

7    does is it takes out the effect associated with the

8    correlation between the credit scores of

9    African-Americans and the credit scores of white

10    borrowers.

11                    THE COURT:  Is there data that you begin

12    with?

13                    MR. KLEIN:  Yes, your Honor.

14                    THE COURT:  Basic data that shows

15    African-Americans got a higher rate than whites?

16                    MR. KLEIN:  Yes, your Honor.  That is the

17    data in Table 3 of Professor Ayres' report.

18                    THE COURT:  You know, I have reports like

19    that.  I confess, I have not reviewed them.

20                    MR. KLEIN:  Well, Professor Ayres has done

21    an extraordinarily extensive and thorough report, your

22    Honor.  Professor Ayres is probably the leading

23    econometrician in the country, who also is a law

24    professor, and what he's done is he's applied statistical

25    techniques and I think did a very thorough lay job of

1 explaining why he's doing what he's doing.

2       So, what he did is exactly what you're

3 talking about.  He started with the raw rate

4 differentials, that 45-basis point difference between

5 Option One's loan price to white borrowers and Option

6 One's loan price to African-American borrowers, and then

7 what he's done is he's looked at 45-basis point

8 difference and he's evaluated what portion of that

9 difference --

10       THE COURT:  What does 45 basis points mean?

11       MR. KLEIN:  .45 percent.

12       THE COURT:  Okay.

13       MR. KLEIN:  Each 100th of a percent is one

14 basis point.

15       So, what he's done is he's then looked at

16 whether any part of that 45-basis point disparity can be

17 affected by things like differences between average black

18 -- African-American credit scores and average white

19 credit scores, and some can be explained, and we

20 acknowledge that and we're candid about it, but 8.6 basis

21 points of difference can't be explained except by

22 differences in the --

23       THE COURT:  .86 or .086 percent?

24       MR. KLEIN.  .086 percent.  8.6 basis points

25 is .086 percent.

1                    THE COURT:   Okay.

2                    MR. KLEIN:   The disparities are small, but

3    they're significant, your Honor.   I don't want to leave

4    this point without explaining that a disparity as little

5    as .086 basis points on average means that Option One's

6    African-American borrowers were paying $135 more per year

7    for their loans than similarly-situated white borrowers

8    and, quite frankly, what this case is about -- because

9    there's no legitimate difference, adding $135 a year for

10   African-American borrowers, first of all, adds a lot of

11   money --

12                   THE COURT:   You mean on average?

13                   MR. KLEIN:   On average.   It adds a lot of

14   money to Option One's bottom line, but also it -- what it

15   does is it creates a situation where people are putting

16   more money into their home and not getting anything in

17   return.   This is pure differential cost.   It's higher

18   cost.

19                   THE COURT:   Is it your position that for

20   purposes of class certification, the parties are

21   comparable, or whatever the word is in the rule, because

22   they all suffered regardless of -- I mean, when you talk

23   about an average difference --

24                   MR. KLEIN:   Yes.

25                   THE COURT:   -- you're talking about a vast

1  difference from one to the -- from the lowest one to the

2  highest one?

3           MR. KLEIN:  Correct, the entire -- as

4  Professor Ayres explained in his reply report, the entire

5  distribution shifts.  That is, that when you look at the

6  averages, essentially, everybody is affected because

7  everyone pays a higher rate than they would have paid if

8  they were white.

9           The other way I think about it, your Honor,

10 is to --

11          THE COURT:  No, but is that what you count

12 on for purposes of meeting the commonality requirement?

13          MR. KLEIN:  Yes.  Yes, your Honor, and that

14 argument is laid out in our briefs at some length, and

15 that argument was recently reviewed in a virtually

16 identical case called *Ramirez vs. GreenPoint* that was

17 decided by Judge Henderson in the Northern District of

18 California.

19          The *Ramirez vs. GreenPoint* case, your Honor,

20 is a mortgage lending discrimination case against a

21 sub-prime lender that is almost exactly identical to this

22 one.  Judge Henderson looked at evidence that is almost

23 exactly identical to the evidence before you and he

24 certified the class.

25          So, in addition to what we've submitted in

1  our briefs, there is a very strong basis in a recent

2  decision to certify this class and let the case go

3  forward to the merits.

4          THE COURT:  How about the other

5  requirements?

6          MR. KLEIN:  Let me summarize our position on

7  various requirements, but I do want to address the

8  arguments in Option One's brief and what I expect Mr.

9  Brooks will talk to you about shortly.

10         THE COURT:  I would like you to finish in

11  about ten minutes.

12         MR. KLEIN:  I'll do my best.

13         Numerosity, your Honor, is not contested.

14  There's 129,171 minority borrowers in the data set.

15         Commonality, your Honor, is addressed by the

16  proof available through the statistical evidence as well

17  as by the common evidence in 30(b)(6) depositions that's

18  laid out in the brief.  That evidence is, quite clearly,

19  your Honor -- and there's testimony of Option One through

20  a 30(b)(6) witness -- that every borrower was subjected

21  to the discretionary pricing policy.  Every Option One

22  borrower had a loan and had the opportunity to be

23  affected by the policy.

24         Those two issues together under the caselaw

25  -- and it's mostly employment discrimination caselaw, but

PDF created with pdfFactory trial version www.pdffactory.com

1  under the caselaw it's being subjected to the policy that

2  creates the common issue.

3           For the typicality requirements, your Honor,

4  my summary of our brief is that it's sufficient under the

5  caselaw -- and, again, it's typically employment

6  discrimination caselaw -- that plaintiffs and other class

7  members were exposed to the common practice.

8           There are no unique defenses here, your

9  Honor.

10          The unclean hands defense, which is raised

11  by Option One in its brief, is simply not applicable

12  under Supreme Court precedent.  *McKennon* is a case that

13  says that under the discrimination laws, a plaintiff --

14  that there is no unclean hands defense because the

15  congressional policy is to enforce an important -- an

16  important anti-discrimination law, and that principle has

17  been applied to the ECOA by the Fifth Circuit and by

18  Judge Henderson in *GreenPoint*.

19          The statute of limitations issues that the

20  defendant raises is also a red herring, your Honor.  The

21  issue about the statute of limitations was addressed by

22  your Honor in the motion to dismiss decision last year.

23  The Court found that the Continuing Violations Doctrine,

24  which comes out of the *Havens Realty* case of the Supreme

25  Court, is applicable to this case.  And so, therefore,

PDF created with pdfFactory trial version www.pdffactory.com

1  any plaintiffs who are outside the statute of limitations

2  are similarly situated to the entire group of plaintiffs

3  who are asserting their claims under the Continuing

4  Violations Doctrine.

5            On the adequacy requirement under Rule

6  23(a)(4), the defendants have made no real argument.

7  There are eleven plaintiffs here, all of whom have been

8  intimately involved in this litigation virtually from Day

9  One.  All of them sat for their depositions, and then the

10 material on counsel's adequacy is in the record.  We have

11 an extraordinary group of counsel representing the

12 plaintiffs in this case.

13           On the issue of predominance, there are no

14 individual issues.  There is data available on all

15 aspects of the transaction, and in Professor Ayres' two

16 reports he walks through the way in which he would be

17 able to create a damage model, which, essentially, is a

18 ministerial act.  The way you create a damage model in a

19 case like this is to take the amount of the disparity and

20 the length that the borrower was in their loan, which is

21 available from Option One's servicing records, and the

22 rate -- I'm sorry  -- and the amount of the principle

23 balance, and you can tell what the difference -- the

24 different costs associated with each borrower's disparity

25 is and award them a measure of damages based on their

PDF created with pdfFactory trial version www.pdffactory.com

1  circumstances.

2          On the issue of superiority, I think the --

3  that's probably the clearest in the case, that nobody

4  would have a remedy here without the opportunity to

5  present statistical evidence.  No one knows what their

6  neighbor white borrower got.  No one knows who is

7  similarly situated without the existence of the

8  statistical evidence.  So, there's not going to be any

9  individual actions.  Individuals who have this claim can

10 only proceed by way of a class and only through the kind

11 of statistical presentation that we've made to the Court

12 here.

13         Briefly, your Honor, I want to address the

14 arguments I expect Mr. Brooks to be talking about,

15 although I can reserve some of that for rebuttal.

16         I think that the defendants' brief, although

17 it's extraordinarily glib, it's essentially an exercise

18 in misdirection, your Honor.  It's grounded in very much

19 flawed principles of facts and law.

20         The first flaw and perhaps the main flaw is

21 that it asks the Court to rely on its expert analysis,

22 that is Dr. Palia's analysis, as if Dr. Ayres hadn't

23 responded to Dr. Palia's criticisms and as if there was

24 no other -- no alternative.

25         That's just not what needs to happen at this

1   stage of the case, the class certification stage.   If

2   there are differences between the experts, what *New Motor*

3   *Vehicles* and other cases say is that those issues, while

4   you have to look at them and conclude that there may be a

5   way for the plaintiffs to prevail, they need not be

6   resolved for the purpose of class certification, but can

7   be addressed at the merits stage.   That is, you don't

8   have to find that one expert is correct and the other one

9   is wrong in order to certify the class.

10                  In addition, Dr. Palia makes two core

11   points, both of which Dr. Ayres demonstrates are wrong.

12   The first is that Dr. Palia believes, without any

13   evidence in the record, that the brokers are independent

14   decision-makers.   That assumption is entirely contrary to

15   Option One's 30(b)(6) testimony, under which Option One

16   controls the discretionary pricing policy.   These are

17   Option One loans.   Option One tells the brokers what the

18   limits are in terms of how much it can charge in various

19   forms in connection with the loan and Option One decides

20   at the end of the day whether or not the loan complies

21   with its policies.   The idea that the decision-makers are

22   acting virtually independently is just not consistent

23   with the record here.

24                  Nevertheless, what Dr. Palia does is he dis-

25   aggravates the data.   He says we have to look at this on

1  a broker-by-broker basis, and the plaintiffs have to be

2  able to prove that each broker took the authority that it

3  had under the discretionary pricing policy and used that

4  authority to discriminate against minority borrowers, and

5  that's just not right.  That's not what the law is.  At

6  least going to back *Watson vs. Fort Worth Bank*,

7  plaintiffs are entitled to challenge the entity that puts

8  out -- that gives out the discretion to see if -- to

9  determine whether that policy results in bias against a

10 minority.

11          But I think the clenching argument on that

12 point, your Honor, is that Dr. Ayres went ahead and ran a

13 regression that controlled for differences associated

14 with who the broker is, and even after running that

15 additional regression and even after controlling for

16 correlations with who the broker is, there's still a

17 statistically significant positive disparity at 6.5 basis

18 points.  So, I think we may come back here on the merits

19 and be arguing about whether the true disparity is 6.5

20 points or 8.6 points, but, either way, the class should

21 be certified and that issue should be reserved for the

22 merits.

23          The other point that Dr. Palia makes is that

24 Dr. Ayres failed to control for geography by MSA or

25 Metropolitan Statistical Area, and instead Dr. Ayres

PDF created with pdfFactory trial version www.pdffactory.com

1  controlled for geography by use of state.

2         I think Dr. Ayres basically concedes that

3  MSA would be appropriate, but there was no data given to

4  him.  Option One didn't turn over the data associated

5  with MSA for particular loans.  So, when he got that data

6  after Dr. Palia's report was issued, he, basically, asked

7  and said where is the data that we don't have.  He ran

8  additional regressions.  He controlled for the MSA and

9  the disparities actually go up.  The disparities instead

10 of being 8.6 basis points are closer to 8.7 basis points.

11         The other flaw in Option One's brief is that

12 it proceeds as if the only evidence that plaintiffs are

13 putting forward here is evidence in Dr. Ayres' reports,

14 and that's simply not correct.

15         The 30(b)(6) evidence here is summarized in

16 the testimony.  There are also copies of various

17 depositions in the record, and in every case what the

18 evidence establishes is that the discretionary pricing

19 policy itself existed at Option One.  Option One did

20 grant the discretion to brokers and loan officers to set

21 loan prices and, in fact, those -- that discretion was

22 exercised in favor of higher prices for --

23         THE COURT:  Are you saying that giving them

24 discretion was a euphemism for discrimination against

25 African-American borrowers?

1              MR. KLEIN:  What it does -- it's very much

2  like an employment case.  What it does is it creates an

3  opportunity for bias to creep into the system and, in

4  fact, there is --

5              THE COURT:  Why necessarily bias against

6  African-Americans?

7              MR. KLEIN:  I think, you know, it's -- there

8  are a number of academic studies on that issue, your

9  Honor, and Professor Ayres cites many of them.  I think

10  the reality of our society is that there is latent bias

11  against --

12              THE COURT:  I'm not disputing that.  I'm

13  just disputing -- I mean, I'm asking -- I'm not even

14  disputing --

15              MR. KLEIN:  Right.

16              THE COURT:  -- whether discretion

17  necessarily means bias against African-Americans.

18              MR. KLEIN:  It doesn't necessarily mean

19  that, your Honor, and we wouldn't assume it, but we have

20  a combination of the fact of the discretion and the

21  statistical reports showing disparities.  So, we're not

22  simply relying on the 30(b)(6) testimony.  We're relying

23  on the combination of the 30(b)(6) testimony and the

24  showing in the statistical evidence that the result was

25  bias against African-Americans.

1              There's actually some very interesting

2  testimony that's in the brief and in the record, your

3  Honor, under which the 30(b)(6) witness who was

4  testifying about Option One's policies said the reason we

5  used objective credit characteristics was to prevent bias

6  from entering into the system.  So, plainly, Option One

7  knew that when they did allow discretion, that it created

8  this opportunity for bias and it -- I think the reason it

9  results in the disparities that we see is the combination

10 of latent bias that remains in our society against

11 African-Americans and business opportunity.  There's a

12 perception still among the sales force, people who are

13 selling Option One loans, whether as brokers or loan

14 officers, that maybe they can extract a slightly higher

15 fee and, in fact, Option One incentivized the higher the

16 markup, the more the loan officer or broker would earn in

17 the transaction.

18              THE COURT:  Well, is it not counterintuitive

19 that they wouldn't try it with respect to every possible

20 borrower?

21              MR. KLEIN:  Well, I think, again, the

22 analogy is to an employment case.  You know, there are

23 legions of employment cases where the same argument is

24 made, that a company will delegate decision-making

25 authority to local offices to decide who to promote and

1  who not to promote and, in fact, then -- the statistical

2  evidence presented in those cases is that people are

3  promoted in ways that are inconsistent with, for example,

4  job tenure or other objective characteristics.

5            And we have exactly the same thing here.  We

6  have a disparity that Dr. Ayres points out can't be

7  explained by anything objective, anything that could be

8  associated with a legitimate business characteristic and

9  could only be associated with use of the discretion to

10 mark up the rates of African-American homeowners higher

11 than those of whites.

12           THE COURT:  So, the necessary conclusion is

13 that these people were biased against African-Americans

14 and, therefore, charged them more?

15           MR. KLEIN:  I don't think that's a necessary

16 conclusion, your Honor.

17           THE COURT:  Well, what else?

18           MR. KLEIN:  I think for today's purposes,

19 the necessary conclusion is only that there's common

20 evidence that could lead someone at the merit stage to

21 reach a conclusion that this policy impacted -- and,

22 again, the law of disparate impact doesn't require proof

23 of motivation.  What it requires is proof that there was

24 an impact and that proof is present in the record here.

25           THE COURT:  So, the mere policy of giving

1  discretion is the issue?

2           MR. KLEIN:  Yes, your Honor.  And, again,

3  it's well-known that discretionary policies tend to have

4  a negative impact on minorities.  I mean -- I think that

5  the same body of literature is often cited in

6  discrimination cases, your Honor.  There's also the

7  potential for gender discrimination, an issue we haven't

8  looked at.

9           THE COURT:  Thank you very much.

10          MR. KLEIN:  Thank you.

11          THE COURT:  Mr. Brooks.

12          MR. BROOKS:  Your Honor, good afternoon.

13  Thank you.  Brian Brooks for the defendants.

14          Your Honor, there's not a lot that the

15  plaintiffs and the defendants agree on in this case, but

16  there's one thing I think we probably do agree on and

17  that is that this case is very similar to a line of

18  employment cases.  Those cases are discussed in our brief

19  at some length, but the kind of case this is really a lot

20  alike are, for example, university tenure and promotion

21  cases.

22          The way those cases often work is that

23  you'll have a university that has 48 academic departments

24  and there's a dean or a department chair in each

25  department who is responsible for deciding which

1  candidates in the department get tenure or get a

2  promotion, and what often happens in those cases, the

3  plaintiffs come through and they do a university-wide

4  analysis, and they find that one group across the

5  university gets promoted less often than another group.

6  Could be women, could be ethic minorities, some other

7  protected class.

8              And what the defendants have done in those

9  kind of cases is they've said, Well, now, wait a minute.

10 If you look across these 46 departments, it actually

11 turns out that in 42 of the departments the promotion

12 rates are identical.  In many cases women even get

13 promoted at a rate statistically faster than men, but

14 there are these --

15             THE COURT:  This is your favorite pickle on

16 the bench analogy.

17             MR. BROOKS:  Exactly.  Exactly.

18             THE COURT:  Okay.

19             MR. BROOKS:  What happens is there is a

20 statistical anomaly that happens when you have one or two

21 bad apples in an overall non-tainted barrel.  The bad

22 apple taints the barrel.

23             Our contention here is that when the Court

24 sits down and looks at cases like *Stastny* and its progeny

25 going back 30 years, what your Honor will find is that

1  the real dispute in this class certification proceeding

2  isn't whether statistical analysis is appropriate.  I

3  think we both agree that it is.

4        The question instead is how do you employ

5  statistical analysis to make sure that similarly-situated

6  people are being compared as opposed to people who are

7  really different, and it is our contention -- and we

8  believe the caselaw is absolutely clear on this, in a

9  long list of cases, most of which are not mentioned in

10  the plaintiffs' reply brief, that in a case involving

11  things like credit pricing, for example, where you have

12  local decision-makers, these are in this case the

13  brokers, what one has to look at is one has to compare

14  African-Americans either in a metropolitan area where

15  loan prices are set with whites in that area or

16  African-Americans in a given broker with whites who got

17  their loans from that broker, and I want to start --

18        THE COURT:  But Mr. Klein told us that they

19  did that.

20        MR. BROOKS:  Here's what they did, your

21  Honor:  They built a model that included what they call

22  dummy variables.  So, in other words, they're only ever

23  going to give you one result in the statistical analysis.

24  It's going to be a single result, but what they concede

25  is when you add the dummy variable, it makes the apparent

1  national aggregation a little bit smaller, but it doesn't

2  make it go away.  What it doesn't tell you is whether

3  African-Americans in Boston are charged more than whites

4  in Boston.

5              Here's what we found when we actually ran

6  the regression -- and these results aren't disputed.  The

7  significance of the results or the reliability is

8  disputed, but these results are not disputed.

9              What we found, your Honor, is that in the

10  Boston MSA -- and let me, again, if I could, just show

11  you one of my quick demonstratives, why we looked at

12  MSA's.

13              The Federal Reserve Board, which is the

14  federal agency that administers the Home Mortgage

15  Disclosure Act, the principle federal fair lending data

16  collection law, requires that mortgage pricing be looked

17  at on a local MSA basis.

18              Why is that?  It's because in the same way

19  that houses in Boston don't cost the same as houses in

20  Dallas and, therefore, we never compare African-American

21  home prices in Boston with white home prices in Dallas

22  because they would always be higher.  Credit prices are

23  different in different markets for the same reason.  And

24  so, the Fed has said because mortgage markets are local,

25  fair lending pricing data has to be collected and

1  analyzed on a local basis.  So, we had our expert do

2  that, and he looked at the 100 largest MSA's in the

3  United States --

4             THE COURT:  This is in your brief?

5             MR. BROOKS:  This is in our brief.

6             THE COURT:  But these charts are in your

7  brief?

8             MR. BROOKS:  Some of these charts are in our

9  brief.  Others of these are extracts of information in

10  the brief.

11             So, we what found, your Honor, is that in

12  Boston, for example, in the Boston metropolitan

13  statistical area, which is an area in which Option One

14  made 32,000 loans during the class period,

15  African-Americans paid slightly less than whites in

16  Boston.  We found the same thing in Washington, D.C.,

17  where 6600 African-Americans out of a total population of

18  around 15,000 paid less, not more, than whites did in

19  Washington.  So, too, in Denver.  So, too, in Hartford.

20  So, too, in --

21             THE COURT:  Well, there are hardly any

22  whites in Washington.  You have a very concentrated black

23  population in Washington.

24             MR. BROOKS:  This is what's interesting,

25  your Honor.  I'm glad you mentioned that.  Because in

1  Boston, where blacks paid more than whites, blacks
2  represented only nine and a half percent of the Option
3  One loan pool.  In Washington they constitute about 60
4  percent.  In Denver it's about 14 percent.  So, what that
5  shows is that you get those results across an array of
6  cities, whether you have many African-Americans or few.
7            So, too, in an area where you get very, very
8  small discrepancies which are not statistically
9  significant.  In other words, the law says that the
10 prices are the same statistically for blacks and whites.
11 In places like Chicago and Sacramento and Worcester, you
12 get these kinds of results.
13           So, what the caselaw that we cite -- and
14 I'll say more about that in just a moment, but what it
15 says is if what's going on here is that one or two biased
16 coins is creating an appearance of an aggregate bias, but
17 that when you deconstruct and look at what's actually
18 going on, most people weren't, in fact, affected by bias,
19 you have to examine that evidence individually and not on
20 a common basis.
21           And what I really want to make clear, your
22 Honor, today is in this class certification hearing, the
23 issue isn't whether we are all committed to civil rights,
24 as Mr. Klein says.  Of course, we are.  The issue isn't
25 whether eradication of discrimination is important.  Of

PDF created with pdfFactory trial version www.pdffactory.com

1  course, it is.

2         The question in this Rule 23 hearing is

3  whether when we show up at trial before the jury, the

4  evidence relevant to the elements of plaintiffs' claim is

5  going to be the same for everyone in the class or is

6  going to be different, and our contention is that what

7  the statistical evidence shows is we will be allowed --

8  indeed, we will have a due process right to argue to the

9  jury that the 2,972 African-American borrowers in Boston

10 have no claim and judgment should be entered for Option

11 One.  That evidence is not going to apply, unfortunately,

12 for us to African-American borrowers from Los Angeles,

13 where it is true that the evidence shows the statistical

14 disparity, and the fact that the evidence differs so

15 substantially is one of the factors that precludes class

16 certification in this case.

17         Now, the plaintiffs have only one answer to

18 this, only one answer.  Their answer from Professor Ayres

19 -- who, by the way, has never seen a class action that he

20 didn't recommend certification for -- is to say that it

21 is possible hypothetically that when you make a sample

22 size smaller by looking at localities instead of the

23 national data center, it is possible that you can shrink

24 the number of observations so small that you can no

25 longer get reliable results.  That's their only answer.

PDF created with pdfFactory trial version www.pdffactory.com

1          So, we took our expert and we asked him the

2    question.  We said are there standard econometric tests

3    that can be done to find out whether these examples are

4    too small to be reliable.  He ran two of those tests.

5    They're described in our brief.  One is called a power

6    test, a standard test.  The other is called a

7    bootstrapping test, another standard test found in

8    economics textbooks.

9          And what he found is, contrary to the

10   hypothesis of the plaintiffs' expert, these sample sizes

11   are large enough to validate these results, and that's

12   not interesting, your Honor, when you look at some of

13   these numbers.  We have 32,000 total loans in Boston,

14   including almost 3,000 African-Americans.  We have about

15   40,000 loans in Chicago, including 7500

16   African-Americans.  These are not small sample sizes.

17   These are large and the statistical power tests that our

18   expert conducted shows that they are sufficient to get

19   real results.

20          The plaintiffs didn't reply to that.  There

21   is not a word in the plaintiffs' reply brief to say that

22   the power test or the bootstrapping test were either

23   inappropriate or incorrect.  All that's left is the

24   surmise.

25          One way to think about this, your Honor, is

1   this:  Let's imagine hypothetically that a plaintiff

2   shows up in your court next week with a new class action

3   against Option One, and let's imagine instead of bringing

4   it under the federal statutes, it's a Massachusetts state

5   discrimination claim, and let's imagine that the class is

6   limited to Massachusetts borrowers.  Let's imagine that

7   class shows up.  What would we do in that case?  I would

8   argue --

9              THE COURT:  Fight it.

10             MR. BROOKS:  Your Honor, I would argue that

11  what I would do, anyway, and I think what the plaintiffs

12  in that case would do, I think what the Court would

13  require the parties to do is we would look at all of the

14  Massachusetts loans together to start with and we would

15  run the same kind of statistical model that Professor

16  Ayres did here to find out --

17             THE COURT:  But you would point out that

18  Boston is different from Worcester.

19             MR. BROOKS:  That's certainly one thing I

20  would point out, but that's not where the case would

21  start.  Where the case would start, just for inferential

22  purposes, is they look at the Massachusetts borrowers,

23  and what the statistical evidence shows for Massachusetts

24  standing alone is African-Americans did not pay a

25  different price from whites.  They paid statistically the

1  same price as whites, and that case would go away on

2  summary judgment.

3              For class certification purposes, the

4  question is:  Am I not entitled to present that evidence

5  to this jury at trial?  If I am, and if that evidence is

6  different from the evidence relevant to the New York

7  borrowers, then the idea that common issues predominate

8  over individual issues is fallacious and that, your

9  Honor, is at the very core of the case.

10             Now, let me just quickly show you just for

11 30 seconds or less --

12             THE COURT:  Suppose you have all together

13 10,000 borrowers --

14             MR. BROOKS:  Yes, your Honor.

15             THE COURT:  -- whom the plaintiff

16 represents.  Suppose for a moment that as to 5,000 of

17 those -- and this is a national sample -- that 5,000 of

18 them either got lesser rates or the same rates as whites.

19             MR. BROOKS:  Mm-hmm.

20             THE COURT:  Could you not go forward with

21 the other 5,000, the remaining 5,000, as to whom the

22 rates were higher, and then later on in determining

23 damages deal with them?

24             MR. BROOKS:  I think, knowing nothing else

25 about your hypothetical, it might be possible.

```
 1              THE COURT:  Why isn't that possible, then,
 2  in this case?
 3              MR. BROOKS:  Let me show you -- Liz, let's
 4  show the pie chart, if we can.  No.  We'll do that in a
 5  minute.  Let's do the pie chart.
 6              The problem here is this:  The problem is,
 7  your Honor, that we don't have a situation where we're
 8  sort of guesstimating where people fall in the
 9  distribution, half paying the same as or less and half
10  paying more.
11              What we have is this:  As Mr. Klein said,
12  there are about 129,000 African-American borrowers within
13  the class period in this case.  Professor Ayres' model
14  doesn't show a distribution.  It actually predicts a
15  price for each of those people.  That's what the model
16  does.  In fact, as I'll show you in a moment, he goes
17  through each of the named plaintiffs and predicts an
18  actual specific price that each of those borrowers should
19  have received if that borrower was white.
20              When you run that model for the entire
21  class, this is what you find out.  It turns out that of
22  the 129,000 borrowers, you only have 5,000 or about three
23  percent of the entire population who received a price
24  that was statistically higher than the actual price
25  Professor Ayres predicts.
```

1            THE COURT:  How does he do that other than
2  by going through all 129,000 loan applications or --
3            MR. BROOKS:  Let's show the chart from Table
4  9.
5            THE COURT:  -- settlement sheets.
6            MR. BROOKS:  I'll just show you, your Honor,
7  exactly what he does.  What Professor Ayres does -- and
8  this is from Professor Ayres' report.  We've put a
9  heading on this and highlighted something, but this is a
10 photocopy of something from Dr. Ayres' report.
11           You'll see in the second column there
12 predicted APR of white.  This is what he did for each of
13 the named plaintiffs, and our expert simply replicated
14 that across the entire universe.
15           THE COURT:  Of 129,000?
16           MR. BROOKS:  Right.  This is the magic of
17 computers, your Honor.  I don't know how they can do it,
18 but when you have lots of memory, you can do things like
19 that.
20           And what you'll see right here is that, in
21 fact, when you go through these ten individual loans, put
22 aside the 129,000, you'll see that -- the extent to which
23 these differ from the predicted APR is all over the map.
24 So, to take one example, if you look at the Barretts'
25 2006 loan, you will see that the predicted APR that

1 Professor Ayres says the Barretts should have paid if

2 they had been white was 10.592 percent.  Do you see that?

3 And the actual price that the Barretts paid was 10.536

4 percent, which is lower than they should have paid if

5 they had been white, under Professor Ayres' own model.

6 That's the kind of evidence, your Honor, that we ought

7 to, as a matter of due process, be entitled to present to

8 the jury to ask for judgment on that claim.

9         You'll see what some of these other named

10 plaintiffs as well, your Honor -- the indicator is

11 positive for the other differences, but in most --

12         THE COURT:  Why can't that be built into the

13 damages issue rather than the liability issue?

14         MR. BROOKS:  Because the core proof element

15 of the liability claim under the Equal Credit Opportunity

16 Act is that there is a difference.  In a case like this

17 there --

18         THE COURT:  Well, you acknowledge there is a

19 difference as to a certain number of these people.

20         MR. BROOKS:  Let me -- there's another

21 element, your Honor, that I do want to pivot to here, but

22 I do want to just pause on this for a moment.

23         It's not a damages issue that Mr. Barrett

24 got a rate lower than a white person similarly situated

25 would receive.  That is a merits liability issue.  And

1    the question for Rule 23 purposes is, among other things,

2    is the evidence about whether he paid more than he should

3    have common to other borrowers.

4              The damages question is only how much more

5    did he pay, but to prove up a case on the merits, he has

6    to show that he did pay more, and he didn't, and for

7    other borrowers on this list, indeed, your Honor, all of

8    them except the Day, which is highlighted, all of the

9    others paid an amount which, according to Professor

10   Ayres's own difference from "Actual" column, is within

11   the margin of error.  It is not a statistical difference.

12   That's what makes this chart so funny, and this chart is

13   the centerpiece of Professor Ayres' report.

14              If you look at the far right column, you'll

15   see something that we have always found very puzzling.

16   You'll see another difference from "Actual" column.  So,

17   you see another "2" column with the very same heading,

18   and the first difference from the "Actual" column is a

19   real number.  It is the amount they actually paid, minus

20   the predicted amount they should have paid.

21              THE COURT:  And the others --

22              MR. BROOKS:  And then the last one is just a

23   hard-wired number.  The other one just says, Let's just

24   assume the conclusion.  The conclusion we're assuming is

25   every single person, whether in Boston or Denver or

1 Omaha, whether they got their loan from Carteret Mortgage

2 or Aegis Mortgage or another broker.  Let's just assume

3 they all paid the same.  That's an assumption.  That's

4 not proof.

5          The real thing is the third column and it

6 shows different information for different borrowers and

7 for nine out of ten loans it shows a difference that is

8 either less or within the statistical margin of error.

9          We don't have to prove the case on the

10 merits today, your Honor.  I'm not asking you to dismiss

11 the Barretts' claim today.  I'm merely saying that the

12 question of a Rule 23 proceeding is:  Is that evidence

13 relevant?  Is the jury entitled to hear about it, so that

14 they can decide if they believe this or believe that?

15 And if they're entitled to hear that, then that should be

16 the end, but in that, your Honor --

17          THE COURT:  I don't understand that.  I

18 mean, whether the jury hears it or not doesn't mean that

19 I could not take into account whatever the information is

20 provided by both of the experts and decide that for

21 purposes of going forward, Ayres wins and we'll go

22 forward or I'll -- eventually I can rule out those people

23 who show no damage.

24          MR. BROOKS:  I don't think that's right,

25 your Honor.  I don't think -- short of, say, a *Daubert*

1  challenge, I don't think you could decide Ayres wins

2  today.   I think the question you have to find is:   Has

3  Professor Ayers, as a matter of law, not as a matter of

4  economics, provided information that by itself is

5  sufficient to try the case?

6              The reason some disparate effect --

7              THE COURT:   That doesn't require that a

8  particular plaintiff's numbers be able to be shown to the

9  jury.

10             MR. BROOKS:   What it would require is a

11 conclusion that the evidence that is relevant, say, to

12 Mr. Barrett is common to everybody, and this chart really

13 distills the problem.

14             If it were true that every single borrower

15 of the 129,000 class members paid 8.6 basis points more

16 than a similarly-situated white person; in other words,

17 if the right column were the only column, that might

18 suggest you could certify a class.

19             THE COURT:   No, I don't think that is

20 necessary to prove that each of them paid .85 percent,

21 but that each of them paid more than what should have

22 been paid.

23             MR. BROOKS:   That's --

24             THE COURT:   Or some amount more.

25             MR. BROOKS:   Yes, I agree with that, your

1  Honor.  I think you're right about that, but, again, this
2  chart tells you the answer to that, because, as you can
3  see, one of the borrowers actually paid less and nine of
4  the other borrowers paid the same, and you've only got
5  one out of these ten folks who can actually make a
6  statistical case that they paid more than they should if
7  they were white.  That's that point, but I don't want to
8  belabor the point.  I think your Honor and I understand
9  each other.
10         Let me pivot for a moment to talk about the
11  underlying issues in the case.  So, the Federal Reserve
12  tells us that to infer a price difference at all, you
13  have to compare the minority group and the non-minority
14  group in the same MSA, because that's where the prices
15  are set.  That's a place to start.
16         But there's a causation element to
17  plaintiffs' claim as well, and it's sort of funny.  In
18  the plaintiffs' reply brief they say, Well, causation is
19  just a merit issue.  Let's just deal with class
20  certification.
21         The truth is causation, like every other
22  element of the plaintiffs' claim, has to be provable by
23  common evidence.  That's one reason, for example, why
24  reliance-based claims are usually not certified, because
25  the evidence is individualized.

1            So, if we can show the broker information

2  here.

3            Mr. Klein said a moment ago -- I think it's

4  the key point about why causation is relevant and why

5  broker behavior matters in this case.  What he said was

6  that it's not the case that it was Option One who was

7  biased.  He said that in response to your question.  What

8  he said was, "This delegation of discretion to brokers

9  creates an opportunity for bias to creep into the

10 system."  That's what he said.

11           And in the plaintiffs' theory, the place

12 that the bias is supposed to creep into the system and,

13 therefore, create a claim is through these brokers who

14 were the ones who, according to the plaintiffs' theory,

15 are able to rachet up prices on African-Americans more

16 often and more effectively than they are with whites.  I

17 think that's the basic theory.  So, it's the brokers

18 where the rubber actually meets the road.

19           And the problem with that theory is that's

20 just not the case all the time.  Indeed, it's not the

21 case most of the time.  We looked again, as your Honor

22 knows, at the 100 largest brokers of Option One and we

23 ran statistical analyses to find out whether a supposed

24 pattern of discrimination revealed itself across most of

25 the brokers, and what we found is of the 100 largest

PDF created with pdfFactory trial version www.pdffactory.com

1 brokers in the United States, not small sample sizes, to

2 be clear, of the 100 largest brokers in the United

3 States, 87 of the brokers either showed a slightly lower

4 price for African-Americans than for whites or showed

5 statistically the same price for African-Americans than

6 for whites, and what's the green and the blue columns are

7 over here (indicating), your Honor.  So, you see that

8 GMAC Mortgage, where 180,000 of their loans were made to

9 African-American, GMAC as a broker here to Option One --

10                 THE COURT:  Out of how many?

11                 MR. BROOKS:  We could find out very rapidly,

12 your Honor.

13                 THE COURT:  I mean, just -- you know, it

14 makes a difference whether it's out of 100,000 or out

15 of --

16                 MR. BROOKS:  I want to say, your Honor, it's

17 out of slightly less than 10,000, I believe, is the total

18 number of --

19                 THE COURT:  So, this would represent about

20 one percent -- I mean, ten percent?

21                 MR. BROOKS:  Right, which is not too far off

22 of the representation of African-Americans in general

23 population, which is around 12 percent.  At GMAC they

24 simply don't pay more than whites.

25                 There are some other brokers, smaller, but

PDF created with pdfFactory trial version www.pdffactory.com

1    still non-trivial, like Prime Lending, for example, where

2    they actually pay less.  And the problem is when you sit

3    down and you start saying, Okay, even if we have looked

4    only now at the jurisdictions where there might be higher

5    pricing, the next question is, Well, what's causing that?

6    Is it really this discretionary pricing policy they want

7    to challenge?  This would suggest that the evidence about

8    that question isn't the same evidence for all of the

9    class members.

10            What we did to try and get more granular

11   about this, your Honor -- and we tried to really figure

12   out what's going on here, because I think it's common

13   ground that in our society generally, for all kinds of

14   historical reasons, there's been inequitable distribution

15   of goods and wealth and other things as between

16   minorities and whites.  We know this.  And so, it's

17   probably not a surprise in any given population that

18   there would be a moderate disparity between

19   African-Americans and whites.  So, the question is:

20   What's causing that?  And is it something that my client

21   did or is it something else?

22            So, if we put the determinates chart up

23   here, Liz.

24            What we did for the brokers where you

25   actually see a difference, that red column over there,

1   your Honor, we went and we deconstructed the underlying

2   components of the loan price to figure out if it really

3   is this discretionary pricing.  This is another thing

4   that is not so much as mentioned in plaintiffs' reply

5   brief.  There's not a word said about it.

6           We took the 13 brokers, your Honor, that did

7   show statistically a significant difference in price, and

8   based on our expert's analysis, we first started with the

9   assumption that there are four basic drivers of loan

10  prices.  It's APR that we talked about.  And the four

11  basic drivers of an APR are the note rate in the

12  mortgage.  So, if your contract says you'll pay 6 percent

13  a year, that would be the note rate.  There are fees paid

14  to the lender.  Those are often called origination fee or

15  underwriting fee, or something.  That's another cost that

16  gets wrapped up into the APR.  Those things both come to

17  the lender, of course.

18          And then there are broker-related fees.

19  There are broker fees, first of all, and sometimes those

20  are just called that, like a broker fee.  Might be $500

21  to the mortgage broker delivering the loan to you, and

22  then there's something called a yield spread premium or

23  YSP, which is discussed in the plaintiffs' complaint at

24  some length, and those are the four basic drivers.

25          So, when we found these 13 brokers, we

PDF created with pdfFactory trial version www.pdffactory.com

1  thought, Well, let's see if what's going on with those

2  brokers is that the brokers are somehow duping

3  African-American borrowers more than whites into padding

4  their broker fees.  That is, after all, the theory the

5  plaintiffs want to prove to the jury.

6           And here's what we found, if you start at

7  the bottom of this chart.  At the bottom of the chart we

8  found that there are three of these brokers where not a

9  single element of the APR was actually statistically

10 higher for blacks than for whites.  This is another one

11 of those aggregation anomalies, it looks like, because

12 the note rate was statistically the same as for whites,

13 the lending fees, broker fees, all the same.  No reason

14 to think that those three brokers were duping

15 African-Americans based on a delegation of discretion,

16 and our position is we should be able to make that

17 argument for those three brokers, anyway.  It's not going

18 to be relevant to others, but it's pretty darn relevant

19 for several hundred class members.

20          If you move up a little bit, your Honor,

21 you'll see that there were two brokers -- look on the

22 right column -- where there was only one reason why their

23 APR was higher than similarly-situated whites and that

24 was purely the note rate.  It had nothing to do with the

25 broker.  The broker didn't make a nickel relative to

1  similarly-situated whites, only the note rate.

2            And, again, we would argue that whatever you

3  think about that -- maybe we think on the merits that's a

4  good thing or a bad thing or natural thing, but what it

5  isn't is evidence that discretion by brokers caused

6  discrimination.  So, that's unique evidence for two

7  brokers who brokered several hundred loans in the class.

8            If you look up at the next row here, you'll

9  find that four of the brokers had a slightly different

10 drive.  It was a combination of note rate, plus lender

11 fees that drove the difference between blacks and whites,

12 but it wasn't anything related to brokers.  And then you

13 have four where there was some broker correlation.

14           What we would argue, your Honor, is this is

15 just a mess, is what this is.  It's nothing short of a

16 mess.  There isn't a common body of evidence that would

17 permit a jury to say at a trial, Listen, there's a class

18 of similarly-situated African-Americans all across the

19 country, whether they live in Boston or Peoria, whether

20 they got their loan from GMAC or Prime Lending, who all

21 can prove, through common evidence, that they paid more

22 than a similarly-situated white person should pay, and

23 that leads us, your Honor --

24           THE COURT:  Could you please conclude within

25 the next three minutes?

1           MR. BROOKS:  Yes.

2                That leads us, your Honor, to conclude that

3  what the plaintiffs' position is -- and this really is

4  what their expert said in deposition.  The plaintiffs'

5  position is, Listen, Judge, this is a disparate impact

6  case.  It's provable through statistics.  It's,

7  therefore, inherently certifiable.  That's, really, the

8  plaintiffs' position.

9                And what the U.S. Supreme Court said about

10  that theory in the *Falcon* case, where it reversed

11  certification of a disparate impact class, is this:  The

12  Court said, "The allegation" -- I'm quoting.  "The

13  allegation that discrimination has occurred neither

14  determines whether a class action may be maintained in

15  accordance with Rule 23, nor defines the class that may

16  be certified."

17                Your Honor, let me make two or three last

18  points here.

19                What you're going to hear from plaintiffs --

20  you've already heard most of this, I think, from Mr.

21  Klein.  The plaintiffs are, essentially, going to say,

22  Look, there are two real big recent cases that dictate

23  their outcome.  One of the cases they're going to cite to

24  you -- and it's the brief -- is the six to five en banc

25  Ninth Circuit decision in a case called *Dukes vs.*

1   *Wal-Mart*, a familiar case, all over the papers.

2                   THE COURT:  D-u-k-e-s?

3                   MR. BROOKS:  D-u-k-e-s, correct.

4                   There are a number of problems with *Dukes*,

5   your Honor.  The biggest problem, the critical problem --

6                   THE COURT:  It's the Ninth Circuit.

7                   MR. BROOKS:  That's a pretty big problem.

8                   There is the old rule that you grant cert in

9   the Supreme Court on the ground that the case came from

10  the Ninth Circuit, but we don't have to get into that

11  here.

12                  The real critical issue with *Dukes*, your

13  Honor, is it was a (b)(2) class, not a (b)(3) class.

14  (b)(2) classes don't require that common issues

15  predominate over individual issues and (b)(2) classes

16  don't require that class treatment be superior to other

17  forms of adjudication.  That's the first reason why *Dukes*

18  simply doesn't apply here.  (b)(2) is radically different

19  analytic regime.

20                  But there's another reason why *Dukes* doesn't

21  apply.  The Ninth Circuit really gave us the reason.

22  It's because -- and I'm quoting here from the Ninth

23  Circuit.  In that case, "Plaintiffs presented evidence of

24  uniform personnel and management structure across stores,

25  headquarter's extensive oversight of store operations,

PDF created with pdfFactory trial version www.pdffactory.com

1  company-wide policies governing pay and promotion, and a

2  strong centralized corporate culture, among other

3  things."

4             Even if it weren't a (b)(2) case, which is

5  enough to disregard it in its entirety, those factors are

6  the opposite of this case.  This case says Option One

7  exercised no control over these guys.  What it did that

8  is challenged is it failed to control them.  It gave them

9  discretion and it was the discretion that was the

10 problem.  That's the opposite of the *Dukes* case, Judge.

11            The other case you heard Mr. Klein talk

12 about, of course, is the *GreenPoint* case.  What I would

13 say about the *GreenPoint* case, your Honor, is basically

14 this:

15            Mr. Klein and some other colleagues of his

16 have sued virtually every lender in the United States

17 that made sub-prime loans, some of them large banks like

18 Wells Fargo, some of them lenders like GreenPoint or

19 Countrywide, some are my clients.

20            The fact that in *GreenPoint* the evidentiary

21 record didn't support the kind of argument I'm making

22 today and, therefore, certification was granted, is no

23 more relevant to this case than it would be to go into a

24 product class action where Ford is the defendant and it

25 is alleged that GM was found to have made a bunch of

PDF created with pdfFactory trial version www.pdffactory.com

1  defective cars.

2          Ford, of course, would argue we didn't use

3  that engine.  We didn't use that tire design, or

4  whatever, we have a different set of facts.  In

5  *GreenPoint* no one argued and there was no evidence that

6  on a market-by-market basis African-Americans did better

7  than or the same as whites.  That is not in that case.

8  No such argument was made.  And so, those cases, we

9  think, your Honor, fall away.

10          Let me make one last set of points that I

11  can make in about 30 seconds, your Honor, apart from the

12  statistical issues.

13          I'm not going to belabor the Court with the

14  full legal discussion.  You will see the briefs with our

15  discussion of the *Stastny/Weiner* cases, but apart from

16  that issue, there are several just nuts and bolts issues

17  why this class doesn't work.

18          One is -- you heard Mr. Klein talk about a

19  lot about Option One, the evil sub-prime lender.  There

20  are, actually, two defendants in this case, Option One

21  and H&R Block Mortgage, and H&R Block Mortgage is not

22  primarily a sub-prime lender.  It's a prime lender, first

23  and foremost, that also made sub-prime loans, and it is

24  undisputed in the class certification record that the

25  loan origination process of H&R Block Mortgage was

PDF created with pdfFactory trial version www.pdffactory.com

1   radically different from Option One.  For example, Option

2   One originated --

3                    THE COURT:  Are we talking only about one or

4   both?

5                    MR. BROOKS:  The case is about both.  The

6   class asks you to lump them both together.

7                    THE COURT:  Okay.

8                    MR. BROOKS:  Just as in your prior case, the

9   question was -- you know, you got the collective

10  bargaining agreement plaintiffs and the non-collective

11  bargaining agreement plaintiffs.  How can you possibly

12  lump them together?  Here you got Option One borrowers

13  and HRBMC borrowers.

14                   The way that these differ, very briefly, is

15  that Option One originated loans through brokers and

16  HRBMC did not, and Option One only made sub-prime loans,

17  but H&R Block considered every single mortgage applicant

18  for a prime loan and wouldn't give them a sub-prime loan

19  if they qualified first for a prime loan, and we would

20  argue that the evidence of those two processes that have

21  nothing whatever to do with each other certainly cannot

22  be treated together in a single trial.

23                   Second, as we've demonstrated in the case,

24  one of the key allegations in the complaint and one of

25  the key drivers of APR is something called yield spread

 1  premium, the --

 2              THE COURT:  What?

 3              MR. BROOKS:  Yield spread premium, your

 4  Honor.  It's the YSP that we talked about.

 5              This class, in the plaintiffs' theory,

 6  extends back to the 1990s.  Option One alone among the

 7  sub-prime lenders --

 8              THE COURT:  I thought it was 2004.

 9              MR. BROOKS:  We wish that were so, your

10  Honor, and, certainly, we think that's what limitations

11  law should dictate.

12              But in the plaintiffs' theory, this case

13  goes back to 1999, I want to say.  That's their theory,

14  an eleven-year class period.

15              The point is this:  Option One did not allow

16  the use of YSPs, which were controversial, until the

17  very, very end of 2004 and, yet, YSPs are a central part

18  of their alleged scheme to allow discretionary pricing.

19  So, again, you can't have pre- and post-2004.

20              And the very last point, your Honor, I

21  promise --

22              THE COURT:  That's a long 30 seconds.

23              MR. BROOKS:  To be clear, I only promised 30

24  seconds on the HRBMC response.  This is another --

25              COURT REPORTER:  I'm sorry, you lost me.

1          MR. BROOKS:  Let me just withdraw that.

2          But the last point, your Honor, is Option

3 One engaged in manual loan underwriting up until 2005,

4 and starting in 2005 Option One transitioned to a

5 computer-based automated underwriting system.  That

6 doesn't exactly speak to the broker discretion issue that

7 the plaintiffs talked about, but their own expert,

8 Professor Ayres, concedes that that is a completely

9 different system that would have to be analyzed

10 separately.

11          The end of the day, your Honor, this just

12 doesn't feel like your traditional disparate impact case

13 where you've got, say, an employment test that everybody

14 took and one group did better than another group.

15 Everybody didn't take the same test here.  They went to

16 different brokers.  They took their loans in different

17 markets, and the idea of a national 129,000 member class,

18 given that evidentiary record, is not the kind of common

19 trial that Rule 23 envisions.  Thank you, Judge.

20          THE COURT:  Thank you.

21          Five minutes.

22          MR. KLEIN:  Thank you, your Honor.

23          Mr. Brooks has just taken some extraordinary

24 gambles with his time.  First of all, your Honor, he

25 seems to think that you're going to be willing to

1  overrule the decision you made on the motion to dismiss

2  here, which is that this company which had a national

3  policy delegating discretion in the same way nationally

4  to every one of its brokers across the country is not

5  going to be testable under a disparate impact test for

6  that discretion.

7          What Mr. Brooks wants you to do now at this

8  stage of the case is to say this really is a disparate

9  treatment case where we have to prove that the individual

10 brokers discriminated in order to make out our case.

11 What that would do is it would overturn at least 20 years

12 of caselaw going back to *Watson vs. Corporate Bank*, in

13 which Justice O'Connor, writing for the Court, said you

14 can test a policy of delegated discretion for the impact

15 of that discretion on class members as a whole.

16         There are literally hundreds of reported

17 decisions and probably thousands of cases that have been

18 in the American court system since that time in which

19 delegated discretion has been challenged without proof

20 that Mr. Brooks' claims would be relevant for the jury of

21 what individual brokers' choices are.

22         The second -- and, quite frankly, your

23 Honor, that very issue was addressed in the *Dukes* case,

24 and Mr. Brooks helpfully pointed out there are a lot of

25 problems with the *Dukes* case.  The biggest problem for

PDF created with pdfFactory trial version www.pdffactory.com

1  Mr. Brooks is that that decision goes directly against

2  the position he's articulating here.  The Court in *Dukes*

3  concluded that you can use statistical evidence to

4  establish that delegated discretion works against a

5  protected class, in that case a class of women employees

6  of Wal-Mart.

7           The second biggest gamble that Mr. Brooks

8  just took is that you won't read the Ayres' report.

9  Professor Ayers goes to great lengths to explain that he

10 is studying the effect of the policy, which is what

11 disparate impact evaluation requires, and not the effect

12 on the individuals, but the effect on the protected group

13 as a whole, and that necessarily requires proof of

14 averages.

15          The argument that Mr. Brooks makes about not

16 having a comparable group in Boston or having a slightly

17 positive and not an extremely positive result in some

18 jurisdictions, but a highly positive result in other

19 jurisdictions, that cuts both ways, your Honor.

20          If Mr. Brooks were right on that point, I'd

21 simply go around the country and find the pockets of

22 Option One customers -- remembering that Option One, of

23 course, had a national policy and not a local policy on

24 discretion.  I would find the pocket and I'd litigate

25 just for that pocket.  I would say Tennessee looks like a

PDF created with pdfFactory trial version www.pdffactory.com

1   good jurisdiction and Boston doesn't.  So, we would have

2   to go to Tennessee, but that's not what the law is.  The

3   law is that you look at a national policy for its

4   national effects.

5           Now, Mr. Brooks makes the point that there

6   were different rate sheets and different local markets,

7   and that's absolutely right, but that's not at all

8   related to the policy that's been challenged here.  The

9   policy that's challenged here is the discretionary

10  element of the price, and the evidence in the 30(b)(6)

11  depositions is that that operated exactly the same way in

12  every jurisdiction and in every local market, and Dr.

13  Ayres does an excellent job of --

14          THE COURT:  With the same results

15  everywhere?

16          MR. KLEIN:  The same -- I'm sorry?

17          THE COURT:  With the same impact everywhere?

18          MR. KLEIN:  Well, the impact is measured --

19  it's the impact of the policy.  It's not the impact of

20  the policy in a particular marketplace.  The bottom line,

21  your Honor --

22          THE COURT:  I don't understand that.

23          MR. KLEIN:  Well, if it were the impact of a

24  policy in a particular marketplace, you would have to

25  aggregate groups -- you couldn't -- you know, what Mr.

1   Brooks would want you to do would prevent anyone from

2   ever litigating a national policy.  It's directly

3   contrary to the way the en banc court in the *Dukes* case

4   evaluated the evidence there.  You would never be able --

5   because you would have to aggregate the individual claims

6   of only those people who were treated differently, and

7   that's not what disparate impact is.  Disparate impact

8   is:  What is the impact of the policy on the group?  Who

9   is affected by that impact?  And the reality --

10              THE COURT:  Well, is it your position that

11   each of the plaintiffs was, in fact, adversely impacted?

12              MR. KLEIN:  Yes, your Honor, in every way,

13   and Dr. Ayres --

14              THE COURT:  Then you disagree with the

15   numbers that Mr. Brooks' expert came up with as to their

16   not having been disparately impacted compared within this

17   -- within this economic unit?

18              MR. KLEIN:  Yes.  And that goes to the third

19   gamble that Mr. Brooks took in his argument, which is

20   that he expects that you won't read Dr. Ayres's reply

21   report in which he explains that Dr. Palia's approach,

22   when you take it down to individuals -- which is

23   completely inconsistent with disparate impact litigation,

24   but if you took it down to individuals, you're going to

25   have a very hard time finding statistically significant

PDF created with pdfFactory trial version www.pdffactory.com

1   results because you're only looking at one observation.

2   You're not -- you're robbing the statistics of any

3   predictive power and that --

4          THE COURT:  We're not talking about

5   predictive power.  We're talking about the ability to

6   show what happened.

7          MR. KLEIN:  Right.

8          THE COURT:  I mean, we're looking at the

9   past, not about predicting.

10          MR. KLEIN:  Right.  And, quite frankly,

11   that's a merits issue.  For today's purposes, typicality

12   is established by the very chart that Mr. Brooks just

13   took out of context from Dr. Ayres' report.  Typicality

14   is there because every borrower was affected by the

15   disparity associated with the effect of the discretionary

16   pricing policy, and Dr. Ayres ran the other numbers, the

17   one that Mr. Brooks asked you to focus on, solely as a

18   way to check this for robustness, to make sure that these

19   individuals had robust and significant impacts, and he

20   explains that at length, both in his original report and

21   his reply report.

22          Dr. Ayres also explains at some length in

23   his reply report that there are extreme problems with the

24   way Dr. Palia disaggregates the data and, quite frankly,

25   what I think you have here is a situation where Dr. Palia

PDF created with pdfFactory trial version www.pdffactory.com

1    was asked by his employer, which is Option One, to look

2    at the data without looking at the policies.  Dr. Palia

3    was very frank that he did not look at whether there was

4    a discretionary price in place.  He didn't read a single

5    policy document of Option One.  He didn't look at the

6    30(b)(6) witness testimony.  He had no idea that this was

7    a single national policy.  So, his belief that it can be

8    disaggregated is inconsistent with the evidence in this

9    case, and it really makes no sense under the existing

10   state of disparate impact law.

11           Your Honor, at the end of the day, I think

12   what you're going to see when you read the reports is

13   that there is a difference between the experts.  I don't

14   think that you'll find Dr. Palia's report convincing, but

15   even if you find it moderately convincing or somewhat

16   convincing, that doesn't -- it isn't a reason to deny

17   class certification.

18           The fact finder at trial can look at these

19   two different approaches to how the evidence needs to

20   come out and make a decision about which one is more

21   appropriate and make a decision about which damage model

22   makes more sense.  And, in fact, Dr. Palia suggests that

23   you could have a damage model, but you need more evidence

24   than Dr. Ayres had, but what that exposed, your Honor, is

25   that there's a whole data set in Option One's possession,

PDF created with pdfFactory trial version www.pdffactory.com

1 which is servicing records, which we asked for in

2 discovery, which we didn't get.  Presumably, we'll get it

3 in merits discovery.  Dr. Ayres will be able to refine

4 his damage model and get to a precise level of damages

5 for the merits based on litigation.

6          Thank you.

7          THE COURT:  Thank you.  I will take the

8 papers and Court is in recess.

9          (Adjourned, 3:54 p.m.)

10

11

12

13

14          C E R T I F I C A T E

15      I, Catherine A. Handel, Official Court Reporter

16   of the United States District Court, do hereby certify

17   that the foregoing transcript, from Page 1 to Page 61,

18   constitutes to the best of my skill and ability a true

19   and accurate transcription of my stenotype notes taken

20   in the matter of Civil Action No. 08-10157-RWZ, Cecil

21      Barrett, Jr., et al. vs. Option One Mortgage

22              Corporation, et al.

23

24 September 27, 2010   /s/ Catherine A. Handel
   Date                 Catherine A. Handel, RPR-CM, CRR
25

PDF created with pdfFactory trial version www.pdffactory.com